Tim LEATHERS, Commissioner of Revenue and
Deputy Director of the Department of Finance
And Administration for the State of Arkansas
*v.* Ed and Jane WARMACK

00-35 19 S.W.3d 27

Supreme Court of Arkansas
Opinion delivered June 15, 2000

*Philip Purifoy*, Chancellor;

*Michael J. Wehrle*, for appellant.

*Keil & Goodson*, by: *John C. Goodson; Norton & Burgess*, by: *Fred R. Norton, Jr.; Patton, Haltom, Roberts, McWilliams & Greer, L.L.P.*, by: *George L. McWilliams* and *Kirk Patton*, for appellees.

DONALD L. CORBIN, Justice. This case involves the border-city tax exemption for residents of Texarkana, Arkansas. Appellant Tim Leathers, Commissioner of Revenue and Deputy Director·of the Arkansas Department of Finance and Administration (DFA), appeals the Miller County Chancery Court's judgment that Appellees Ed and Jane Warmack were exempt from state income taxes for the years 1992, 1993, and 1994. DFA's sole point for reversal is that the chancellor erred in finding that the Warmacks were residents of Texarkana during the period in question. Our resolution of this appeal requires us to construe the term "resident," within the context of the border-city tax exemption. Because this issue is one of first impression, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1). We affirm the chancellor's judgment.

The record reflects that the Warmacks were audited by DFA for the calendar tax years 1992, 1993, and 1994. The Warmacks claimed that they were exempt from individual income taxes for those years under the border-city tax exemption, as provided in

Ark. Code Ann. §§ 26-52-601 to -607 (Repl. 1997). DFA concluded that the Warmacks were not residents of Texarkana and assessed income tax against them in the amount of $808,686.00, plus interest of $209,950.25. The Warmacks paid the taxes and interest under protest and petitioned the chancery court to review DFA's decision. The sole issue in the chancery court was whether the Warmacks had established residency in Texarkana during the audit period. After hearing considerable testimony and receiving numerous exhibits, the chancellor determined that the Warmacks were residents of Texarkana and, thus, entitled to the border-city tax exemption.

For its sole point for reversal, DFA argues that the greater weight of the evidence demonstrates that the Warmacks were not residents of Texarkana during 1992, 1993, and 1994. As such, DFA contends that the Warmacks failed to prove Texarkana residency beyond a reasonable doubt. DFA contends further that the evidence demonstrated that all through the audit period, the Warmacks continued to reside at their home in Fort Smith. In support of this, DFA points to the facts that the Warmacks maintained their memberships in a Fort Smith country club, continued their banking and medical relationships in Fort Smith, and purchased the "lion's share" of their goods and services in Fort Smith. DFA also relies on the fact that the Warmacks' base of business operations continued to be in Fort Smith during the audit period.

■■ Our standard of review in tax-exemption cases is well established. Tax exemptions are strictly construed against the exemption. *Technical Servs. of Ark., Inc. v. Pledger*, 320 Ark. 333, 896 S.W.2d 433 (1995); *Pledger v. C.B. Form Co.*, 316 Ark. 22, 871 S.W.2d 333 (1994). A strong presumption operates in favor of the taxing power, and the taxpayer must establish an entitlement to a tax exemption beyond a reasonable doubt. *Id.* This standard is applicable to claims of exemption from income tax. *See Morgan v. Cook*, 211 Ark. 755, 202 S.W.2d 355 (1947). On appeal, we review tax-exemption cases *de novo* on the record, but we will not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Technical Servs.*, 320 Ark. 333, 896 S.W.2d 433. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Western Foods, Inc. v. Weiss*, 338 Ark. 140, 992 S.W.2d 100 (1999). We give due

deference to the chancellor's superior position to determine the credibility of witnesses and the weight to be accorded their testimony. *Myrick v. Myrick*, 339 Ark. 1, 2 S.W.3d 60 (1999). With this standard in mind, we review the chancellor's findings of fact.

The chancellor's order reflects that Ed Warmack was in the business of developing shopping malls and warehouses and then leasing them out to tenants such as Sears, Dillard's, and J.C. Penney. Ed owned approximately sixty properties in twelve states, which were developed between 1968 and 1990. Ed's business is family owned and operated, with Ed and his four sons constituting the upper management of the business. Ed originally operated his business out of Fort Smith, where he had the largest concentration of leased property. By 1989, however, the Fort Smith properties had been completely developed. That same year, Ed made the decision to move his residence and business from Fort Smith to Texarkana. Ed owned a shopping mall in Texarkana, Texas, and forty-five acres of "outparcel" land, consisting of the property surrounding the mall. In 1989, the outparcel land in Texarkana was largely undeveloped. The chancellor found that Ed's decision to move to Texarkana was motivated by the desire (1) to develop the outparcel properties in Texarkana, and (2) to take advantage of the border-city tax exemption.

In December 1989, the Warmacks resided in a rental duplex in Texarkana, and they lived there until May 1992. In June 1992, the Warmacks moved from the rental duplex to an apartment, where they resided until October 1993. In October 1993, the Warmacks purchased a duplex in Texarkana and resided in one side of the unit until June of 1996. During the audit period, the Warmacks also owned a home in Fort Smith. In 1990, the Warmacks offered their Fort Smith home for sale through a local realtor, Jimmy Taylor. According to Taylor, the house, which had approximately 7,000 square feet, was constructed a lot like a shopping center and lacked curb appeal. The house also contained asbestos. To properly market the house, according to Taylor, it was prudent to keep it furnished and to maintain the utilities, the yard, the house cleaning, and the alarm system. The house was originally offered at $590,000, and was shown by Taylor numerous times beginning in 1990. There were times when Jane Warmack traveled from Texarkana to Fort Smith to get the house ready to show. Taylor was not

successful in selling the house during the audit period. The house eventually sold for a significantly reduced price in 1997.

It is DFA's contention that the Warmacks were actually residents of Fort Smith during the entire three-year audit period. DFA asserted that a comparison of the utility usage at the Fort Smith house to the usage at the residences in Texarkana demonstrates that the Warmacks really lived in Fort Smith during the audit period. DFA compiled a journal in which it purported to trace the Warmacks' whereabouts for the audit period. The journal revealed that the Warmacks may have been away from Texarkana approximately forty-five percent of each year. The journal could not, however, account for their whereabouts during 208 days in 1992, 207 days in 1993, and 198 days in 1994.

The chancellor found that the Warmacks' absences from Texarkana were for legitimate business, vacation, or medical reasons. The chancellor found further that during the three-year period, the Warmacks traveled to over 120 cities and numerous foreign countries; however, the undisputed evidence showed that the Warmacks were in Texarkana for over fifty percent of each year during the audit period. Additionally, the chancellor was not persuaded by DFA's comparison of utility usage, largely due to the fact that the Fort Smith house had considerably more square footage than the Texarkana residences. The chancellor also found that DFA's comparison of utility usage of similar Texarkana residences was not persuasive, as DFA offered little or no evidence of the occupancy days, the number of residents, or the lifestyles of the occupants of the similar units.

DFA particularly relied on the fact that during the audit period, whenever the Warmacks would travel to Fort Smith, they would stay in their house. This was admitted by the Warmacks, but they contended that as long as the house had not sold, it made sense to stay there, rather than at a hotel, during their visits to Fort Smith. The chancellor found that the Warmacks had made Fort Smith their home for over forty years, during which period of time they developed extensive business and social relationships in the area. Additionally, the Warmacks had developed banking and medical relationships in Fort Smith and continued these relationships after they moved to Texarkana. The chancellor determined that the continued maintenance of these long-time business, social, medical,

and banking relationships was legitimate, particularly in light of the fact that the base of their business operations continued to be in Fort Smith throughout the three-year audit period. The chancellor found further that because the house had not sold and the Warmacks had legitimate reasons for being in Fort Smith, their stays at the house were reasonable under the circumstances and were not inconsistent with their residency in Texarkana.

The chancellor found persuasive the testimony of Dr. Charles Edward Venus, a consulting economist, who gave expert testimony for the Warmacks. The chancellor found that Dr. Venus's expert opinion supported the fact that Ed Warmack had legitimate business reasons for being in Fort Smith from time to time during the audit period. Similarly, the chancellor found that Dr. Venus's analysis of the management of the Warmacks' business supported their testimony that they were required to travel extensively for business reasons. The chancellor was also persuaded by Dr. Venus's analysis of the interrelationship between social and business associations required for successful business operations of the type owned by the Warmacks. The chancellor found that it was not unreasonable, based on Dr. Venus's expert testimony, that the movement of the Warmacks' business from Fort Smith to Texarkana took place over several years, including the audit period, and required the attention of Ed Warmack in Fort Smith. The chancellor concluded that Dr. Venus's expert testimony suggested that the Warmacks' absences from Texarkana during the audit period were not inconsistent with their residency in Texarkana.

The chancellor also relied on the testimony of Joe Neal Oliver, a Texarkana restauranteur and neighbor of the Warmacks, who stated without contradiction that he had observed the Warmacks in Texarkana during the audit period. Oliver stated that the Warmacks were customers of his restaurants. He also stated that he would pass by the Warmacks' first Texarkana residence three or four times a day and that he would occasionally stop and converse with Ed Warmack. He stated that Ed had spoken to him about his desire to purchase a house in Texarkana and asked about a good location. Oliver testified that he would see Ed's vehicles parked at the Texarkana residences on the weekends, but not as much during the week. Oliver explained that he made a point to observe the different kinds of vehicles that Ed drove, as he was aware that Ed had a deal with a

local dealership to display the dealer's cars in the Texarkana mall in exchange for being allowed to drive new vehicles.

In addition to the foregoing facts, the chancellor found that during the audit period, (1) the Warmacks were registered to vote and had voted in Miller County; (2) they assessed and paid personal property taxes in Miller County; (3) their drivers' licenses reflected their Texarkana addresses; (4) Jane Warmack received magazines at the Texarkana addresses; and (5) Jane Warmack made only three purchases from Fort Smith grocery stores during the three-year period. The chancellor found that the grocery and gas purchases made by Ed Warmack in Fort Smith were all business expenses that were not challenged as such by DFA during its audit. The chancellor also found that the retention of Warmack Aviation at the Fort Smith airport was not inconsistent with the Warmacks' residency in Texarkana. The chancellor observed that the family business remained in Fort Smith during the audit period and that the flight time between Texarkana and Fort Smith, which was less than twenty minutes, imposed no inconvenience to the Warmacks' business travel.

The chancellor concluded that based on the totality of the circumstances, the Warmacks proved beyond a reasonable doubt that they were residents of Texarkana during the years of 1992, 1993, and 1994. The chancellor found that the questions raised by DFA, regarding the Warmacks' absences from Texarkana, the amount of time they spent in Fort Smith, the delayed sale of their Fort Smith house, the difference in utility consumption between the house in Fort Smith and the much smaller rental units in Texarkana, "all evaporate with reasonable and almost uncontradicted explanation." We cannot say that the chancellor's ruling was clearly erroneous.

The border-city tax exemption was created by the General Assembly to equalize the income tax burdens on residents of Texarkana, Arkansas, and Texarkana, Texas, due to the fact that Texas does not impose a state income tax. See section 26-52-601. DFA Individual Income Tax Regulation 1.26-51-403(b)(13) was promulgated to implement this tax exemption. That regulation defines "Texarkana, Arkansas, Resident" as "an individual who maintains a place of abode within the city limits of Texarkana, Arkansas." The term "place of abode" is not defined within the

border-city regulations, but it is defined in DFA Regulation 2.26-51-102(9), which addresses the issue of whether a person is a resident of the State of Arkansas.

Under regulation 2.26-51-102(9), a person is a resident of Arkansas if he or she (1) is domiciled in the state, or (2) maintains a permanent place of abode within Arkansas and spends an aggregate of more than six months of the year within Arkansas. Subsection (a) provides in part:

> Domicile is comprised of an act coupled with an intent. A domicile is acquired by (1) physical presence at a place coinciding with (2) the state of mind (that is, intent) of regarding the place as a permanent home.

Subsection (b) defines the term "place of abode" as follows:

> Place of abode means a place where a person has established a permanent home, *even though such person may be absent therefrom for a long period of time.* A temporary home or residence would not be considered a place of abode, as there must be at lease some degree of permanence....

> Place of abode and residence are considered to mean roughly the same thing. However, domicile and residence are not considered to be synonymous. Residence denotes only an act (the act of residing), while domicile denotes an act (the act of residing) coupled with the intent that the residence be a permanent home. *The distinction between domicile and place of abode is that although a person can have several homes (or places of abode) at one time, only one of those homes can be the person's domicile.* The home that the person intends or considers to be their permanent home (as in home base) would be the domicile. [Emphasis added.]

Subsection (c) of regulation 2.26-51-102(9) provides that where it is not clear that the person is domiciled or maintains a place of abode in Arkansas, a residency determination may only be made after thoroughly reviewing the facts on a case-by-case basis. Various factors should be considered in making this determination, such as the party's address used on federal income tax returns, utility bills, voter registration, driver's license, vehicle registration, and property assessments. Under this case-by-case analysis, a taxpayer's claim of intent will not be accepted when the circumstances point to a contrary conclusion. Moreover, when acts are inconsistent with a taxpayer's declarations, the acts will control.

 Under our case law, the distinction between the terms "domicile" and "residence" is often subtle; however, this court has consistently held that the terms are not synonymous. *In Re: Adoption of Samant*, 333 Ark. 471, 970 S.W.2d 249 (1998) (citing *Stephens v. AAA Lumber Co.*, 238 Ark. 842, 845, 384 S.W.2d 943, 945 (1964)). A person's "residence" is the place of actual abode, not a home that a person expects to occupy at some future time. *Id.* This court has defined "place of abode" as "something more than a place of temporary sojourning," implying a degree of permanence. *Shinn v. Heath*, 259 Ark. 577, 587, 535 S.W.2d 57, 62 (1976) (quoting *Cravens v. Cook*, 212 Ark. 71, 74, 204 S.W.2d 909, 910 (1947)). "[A] given place may be a 'place of abode' of a party, though he may be actually absent therefrom for a long period of time." *Id.* No particular length of time is necessary to establish residence. *See Cole v. Cole*, 233 Ark. 210, 343 S.W.2d 561 (1961); *Smith v. Smith*, 219 Ark. 876, 245 S.W.2d 207 (1952). Rather, the key consideration is whether the place is an "established abode, fixed permanently for a time for business or other purpose, although there may be an intent existing all the while to return at some time or other to the true domicile[.]" *Krone v. Cooper*, 43 Ark. 547, 551 (1884). *See also Davis v. Holt*, 304 Ark. 619, 804 S.W.2d 362 (1991). Each case must be decided on its own facts. *Id.*

 On the other hand, this court has long recognized that "domicile has a broader meaning than residence, and includes residence." *Shinn*, 259 Ark. at 586, 535 S.W.2d at 61 (quoting *Jarrell v. Leeper*, 178 Ark. 6, 7, 9 S.W.2d 778, 778 (1928)). *See also Krone*, 43 Ark. 547. Thus, "domicile" requires an actual residence plus the intent to remain in a particular place. *Samant*, 333 Ark. 471, 970 S.W.2d 249; *Martin v. Hefley*, 259 Ark. 484, 533 S.W.2d 521 (1976). "No word, it is said, is more nearly synonymous with domicile than home, and it is generally agreed that a man can have but one home or domicile, but that he may have more than one place of residence." *Krone*, 43 Ark. at 549. Thus, like residence, no particular length of time is required to establish one's domicile, "but there must be residence attended by such circumstances surrounding its acquirement as to manifest a bona fide intention of making it a fixed and permanent place of abode." *Moon v. Moon*, 265 Ark. 310, 313, 578 S.W.2d 203, 205 (1979). The intent to abandon one's domicile and take up another must be ascertained from all the facts and circumstances of the particular case. *Morris v. Garmon*, 285 Ark. 259,

686 S.W.2d 396 (1985). The factfinder is not bound to accept claims of intent when the circumstances point to a contrary conclusion; they cannot prevail unless borne out by acts. *Charisse v. Eldred*, 252 Ark. 101, 477 S.W.2d 480 (1972). "When acts are inconsistent with a person's declarations, the acts will control, and declarations must yield to the conclusions to be drawn from the facts and circumstances proved." *Id.* at 105, 477 S.W.2d at 482.

█ In the present case, we conclude that under either the definition of "domicile" or "residence," as set out in this court's holdings or DFA's regulations, the record supports the chancellor's determination that the Warmacks were residents of Texarkana during the audit period. Much of the evidence in this case turned on the credibility of the witnesses and their testimony, and we give due deference to the chancellor's credibility determinations. The chancellor specifically found that although the Warmacks were away from Texarkana for extended periods of time, their absences were for legitimate business, medical, or personal reasons. Moreover, despite their long absences, the uncontradicted evidence demonstrated that the Warmacks were at home in Texarkana more than fifty percent of the time during those three years. Furthermore, the evidence showed that the Warmacks were registered to vote and had voted in Miller County, that they assessed and paid personal property taxes in Miller County, and that their drivers' licenses reflected their Texarkana addresses. Perhaps more significant is the testimony of Joe Neal Oliver that during the period in question, the Warmacks were patrons of his restaurant and he often saw Ed Warmack's vehicles parked at the Texarkana residences. He also stated that he periodically saw Ed Warmack either coming home or going out, and he would stop and converse with him. Accordingly, we cannot say that the chancellor was clearly erroneous in finding that the Warmacks were residents of Texarkana during 1992, 1993, and 1994. We thus affirm the chancellor's judgment.